UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| V. | * | Cr. No.   MJG-15-322 |
| **MATTHEW HIGHTOWER, ET AL.** | * | |
| **Defendant** | * | |
| For:   **MATTHEW HIGHTOWER** | * | |
| | * | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AS TO THE "CRIME OF VIOLENCE IN FURTHERANCE" PROVISION OF COUNT TWO OF THE PENDING INDICTMENT AND FOR JUDGEMENT OF ACQUITTAL ON COUNT TWO GENERALLY FOR LACK OF FEDERAL JURISDICTION**

Matthew Hightower, by his undersigned counsel, Richard Bardos, Of Counsel, Schulman, Hershfield & Gilden, P.A., hereby submits this memorandum in support of his Rule 29 motion previously filed and states:

## INTRODUCTION

In his pretrial motion to dismiss count two, this defendant argued that the Government's proof could not, as a matter of law, meet two of the essential elements of 18 U.S.C. sec. 1952(a)(2).[1]   Specifically, the defendant argued that the crime of violence in furtherance of extortion provision must fail because a) no property was obtained when David Wutoh was killed and b) extortion requires that any property to be obtained with the consent of the debtor, a condition impossible to be met once Mr. Wutoh died.   The primary focus of this post-trial motion is on the failed second issue- the metaphysical impossibility of posthumous consent.

---

[1] Section 1952(a)(2) addressed a defendant who "commit[s] a crime of violence to further an unlawful activity" and increases the maximum penalty from 5 years to life in jail if death results.

1

**I.   The Government Failed to Prove Either That Property Was Obtained or That the Victim Gave His Consent to Any Payment**

   A.   The Government Failed to Prove any Attempt to Obtain Property in the Killing of David Wutoh

The facts establish that no property was obtained on September 22, 2013, at the time that Mr. Wutoh was killed.   In lieu of proof that any property was obtained, as required by the statute, the Government proffers that the defendant, through his co-defendant Harry Crawford, <u>attempted</u> to obtain property by first killing Mr. Wutoh and then collecting from his will.   The Government seeks to meet this element of extortion through a conversation between Mr. Hightower's co-defendant, Harry Crawford and Andrea Brown, the woman with whom Mr. Wutoh lived in September, 2013.   This conversation occurred at a birthday party for Mr. Crawford's granddaughter, about five weeks after Mr. Wutoh was shot.   According to Ms. Brown, the only person to testify about this conversation, Crawford asked Brown not about himself, but whether Mr. Wutoh had left anything to Ms. Brown or her daughter in his will.   Crawford expressed surprise that Wutoh had not left anything for either Brown or her daughter; Crawford never asked if Wutoh left anything to him.   (Texts were presented between Crawford and Wutoh in which the former asked to be put in the latter's will, and Wutoh replied "you are."   In fact, Mr. Wutoh had neither a will nor any disposable assets.)

Despite the plain language of this conversation as testified to by Ms. Brown, the Government inserts, with no factual basis, that Crawford's inquiry regarding Brown's status as an inheritor was in fact Crawford's secret, manipulative way of finding out whether Wutoh had any assets from which Mr. Hightower's loan could be repaid in

full. Because the absence of consent is so blatant and dispositive, the defendant need not argue about the Government's creative musings on this issue.

    B. Mr. Wutoh Did Not Consent to His Own Murder

One further matter should be addressed before moving on to the hornbook law on extortion. The Government has also suggested that *if* Crawford expected to be paid from Wutoh's will, and *if* Wutoh had a will (which he did not) and *if* Wutoh had disposable assets (which he did not, according to his brother's testimony) and *if* the executor of the non-existent will paid Crawford from the non-existent assets, then such payment would be "with the consent of the debtor" as the statute requires. The unavoidable flaw in this position is that absent a planned suicide, no one pays out from his or her will "by consent." Even if distribution from an estate is by the direction of the decedent, the *fact* that the will is being executed is not by consent of the decedent; a necessary condition to execution of the will is the death of the decedent. There is no evidence whatsoever here that David Wutoh consented to his own death. There is no evidence whatsoever here that Wutoh consented to be killed *so that* his debts could be paid from his estate.

Indeed, Mr. Wutoh knew that such an eventuality was impossible. He knew his life insurance had lapsed; he was the one who failed to pay the policy. And he knew, in all likelihood, that he did not have the assets to pay off his debts, as his brother testified at trial. Dr. Wutoh testified that David owed him money, as well as others and that even after the cars were sold and their liens paid off, there was still nothing left to constitute an "estate." Most importantly, David Wutoh, above all people, knew he did not have a will. Thus, this case presents the converse of the popular saying - if there is no will, there is no way. Therefore, even *if* Wutoh *had* consented

3

to his own death, such consent could not have included the expectation of posthumous payment to the defendant.

    C.    Because Posthumous Consent is Impossible, the Killing of Mr. Wutoh Was Not In Furtherance of an Extortion Scheme

In its Order denying Mr. Hightower's pretrial motion, the Court summarized the defendant's consent argument as follows: "In brief, once murdered, D.W. could no longer consent to any payment." ECF 231 at 18. The Court acknowledged that the "hypothetical examples presented in the Government's Response do not address the defense contentions." *Id*. The Court declined to dismiss the crime of violence in furtherance part of count two prior to trial, stating that "[t]here appear to be significant issues presented regarding the ability of the Government to prove that the murder of D.W. was in furtherance of the charged extortionate scheme for purposes of Section 1952(a)(2)(B)." *Id*. at 19. The Court stated further that it would "address issues regarding the adequacy of the Government's proof in light of the evidence presented at trial.

Trial lasted six days. The Government presented no evidence that Mr. Wutoh consented to any payment to either Crawford or Hightower after Wutoh died.

The taking of property without the consent of the victim is called theft. Taking of property *with* the consent of the victim where that consent was only inspired by the wrongful use of actual or threatened force, violence, or fear is called extortion. In the latter case, the victim, to avoid the potential harm he faces, agrees to pay over the money demanded. This aspect of 'consent" is unique to extortion law - traditionally, consent given only under duress is not valid. See *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Regardless, extortion requires the consent of the victim. Because Mr. Wutoh was killed, he could not consent to giving over any property. As a result,

the killing of Mr. Wutoh, as a matter of law, cannot constitute a crime of violence in furtherance of the unlawful activity of extortion.

By statutory definition, a person cannot commit a crime under 18 U.S.C. sec. 1952,unless the crime of violence (here murder) is in furtherance of an unlawful activity (here the extortion scheme).   [T]he term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."   18 U.S.C §1951(b)(2). Here, there could be no consent.   The killing of Mr. Wutoh ended whatever extortion scheme the Government thinks was going on, it could not possibly have furthered it.

When a person lends money to one person and then kills their only debtor (even after a series of allegedly extortionate texts), the extortion ends.   The killing therefore cannot be in furtherance of the improper attempt to collect a debt - the debtor cannot pay.   Killing one's only debtor is a self-defeating method for attempting to collect a debt.   The Government has failed to prove consent by Mr. Wutoh and therefore, the portion of count two under subsection (b)(2) and its attendant sentencing enhancements under (b)(3) must be dismissed.

D.   Show Me the Debtor!

In its pretrial presentation on the "in furtherance" issue, the Government deflected any real response to the lack of consent issue by suggesting that there would be evidence of "reputational calls" by Mr. Hightower.   In theory, if Mr. Hightower were to use the shooting of Mr. Wutoh to influence and frighten other debtors, not just people, but other of his debtors, and those debtors were scared into paying back their loans to the defendant as a result, perhaps the shooting of D.W. could be in furtherance of <u>an</u> extortion scheme, albeit not the one charged in the instant

5

indictment. Thus, perhaps aware that a dead man cannot give his consent to anything, the Government shifted to trying to prove beyond a reasonable doubt that the killing of Mr. Wutoh created illegal consent <u>in someone else</u> who owed money to the defendant.

The proof at trial, however, did not show that anyone else who owed money to the defendant and, accordingly, failed to show any other debtor whose consent was intended to be induced by the shooting of Mr. Wutoh. The "reputational calls" theory did not pan out.

Although the Government did present a series of calls in which Hightower discussed the loan to Wutoh and his frustration with the slow repayment, and his anger towards harry Crawford for "signing off" on Wutoh as a good bet, none of the calls establish any attempt by Mr. Hightower to influence any of his other debtors. No evidence of other debtors existed.

Even if the calls were as the Government imagines them, *i.e.*, that they were Mr. Hightower bragging about his reputation and that no one takes advantage of him, the calls contribute nothing to proving the crime alleged of extortion. For the calls to Devon Carter to make the killing of Wutoh in furtherance of an extortion scheme, Carter would have to be a) a debtor of the defendant who b) Hightower intended to influence or frighten into consensual repayment of a debt c) through the killing of Wutoh for Wutoh's non-payment. In essence, the evidence would have to show that Mr. Hightower intended to use the killing of Mr. Wutoh for non-payment to scare Mr. Carter into paying his own debt to the defendant. None of these requirements were established at the trial of this case.

Initially, it must be pointed out that extortion of Mr. Carter was never charged in this case. The only potential victim of extortion ever identified was David Wutoh.

But, even if the indictment could be read in an exceptionally favorable manner for the Government, *i.e.*, that the crime of violence furthered *any possible* extortion scheme by this defendant, the evidence still fails to even suggest any other debtor who was being extorted by this defendant.

Extortion, as defined by statute, and in the third superseding indictment, requires the obtaining of property from the victim with the victim's consent where that consent was obtained by fear or threats of violence.   As the defense has shown, the killing on one's only debtor cannot, as a matter of law, be an act in furtherance of extortion of that debtor because the death renders subsequent consent impossible.   To counter this position, the Government proposed at the motions hearing on August 30, 2016, that there were "reputational" calls made by this defendant regarding the murder of Mr. Wutoh.   It appears that the calls to which the Government was referring are calls between Mr. Hightower and Mr. Carter.

Let us assume that the full breadth of the Government's suggestions regarding these calls is correct: that Hightower was telling Carter that people don't mess with him and if they do, they'll get hurt.   In the most incriminating call, at Government Exhibit 25A in which Hightower and Carter discuss using "toasted bread" and a "biscuit", the anger is expressed against Harry Crawford, not David Wutoh.[2]   Nevertheless, even assuming that the defendant was trying to impress Carter with the

---

[2] In the call, Hightower says "And it's like I just text my boss … and it's making you look bad because you sat there an cosigned this whole deal…"   The defendant is talking about his boss, Harry Crawford, getting him involved in a loan to Wutoh and vouching for Wutoh to pay the money back.   Carter replies "Tell you boss man I'll be home in a year and a half man, don't make me have <u>to come holler</u> at him… tell your boss don't make me cone out there…"   Hightower references the movie *Empire* and asks whether his boss is "trying to do me like that?" and then says "Yeah man I work for my boss that's what I'm saying.   He know what I do.   But I think he think I got more money than what I got."   It is this reference to Crawford to which Carter responds "He playing, he playing games.   Might have to, uh, you might have to <u>go holler at yo</u> with some goons beside you man.   With some toasted bread, man." (Emphases added).   Transcript of call 25 is attached hereto as Exhibit A.

7

defendant's toughness when people mess with him, these calls do nothing to advance the allegation that the defendant used the murder of Mr. Wutoh to further any extortion scheme.

For these "reputational" statements to be part of an extortion scheme, the statements would have to be made to another of Mr. Hightower's debtors in a effort to scare that second debtor into paying back an extortionate loan with consent induced by fear.   Mr. Carter was not a debtor of Mr. Hightower; none of their conversations involve any mention of Carter owing money to Hightower.   Therefore, any statements made by Hightower to Carter were not intended to induce repayment of a loan - there was no loan.   Even if Mr. Hightower had told Carter "I'm going to shoot Wutoh because he didn't pay me back", that statement would not make the killing of Wutoh in furtherance of an extortion scheme because there was no similarly situated second debtor whose actions would be influenced by such a statement.

In closing argument, the Government, for the first time, claimed that Mr. Hightower was a "loan shark."   Juries are told repeatedly that what the lawyers say is not evidence, and this statement by Government counsel provides an excellent example of why that instruction is so important.   There is no evidence whatsoever that Mr. Hightower was a loan shark, or that he ever lent money to any other person.

The lack of evidence on this specific point is fatal to the Government's argument that the killing of Mr. Wutoh was intended by Hightower to influence another of his debtors - there were no other debtors.   Agent Holliday testified that he listened to over 20 hours of jail calls between Hightower and Carter; not one single call discusses any other loan made by Mr. Hightower to anyone.   Agent Holliday testified that he reviewed all of the texts between Hightower, Crawford, Wutoh and others; again, not one text that mentions any other loan made by this defendant.

8

Three years of investigation by the Baltimore County Police Department, the Department of Homeland Security, the Federal Bureau of investigation and the Office of the United States Attorney, including 27 witnesses brought before the Grand Jury and not one single other debtor was ever identified.   The Government's "loan shark" claim, while imaginative argument, finds no support in the actual trial evidence.   The killing of David Wutoh, which the jury found it was punishment for non-payment under count one, cannot possibly be in furtherance of extortion; the killing of one's only debtor terminates the extortion scheme; it cannot further it

**II.   Federal Jurisdiction Cannot Be Based on the (Un)Fortuitous Choice of a Cell Phone Plan**

The sole basis for federal jurisdiction for count two (18 U.S.C. sec. 1952, known generally as the "Travel Act") in this case arises from the random chance that the defendant used a Cricket phone instead of an AT&T phone.   Federal jurisdiction cannot depend on the happenstance that texts involved in a Maryland crime were routed by the phone company outside of Maryland.

The parties agree on the following facts:    1) all of the physical acts in this case occurred within the State of Maryland; 2) the texts at issue were sent by the defendant in this State and received by Mr. Wutoh in Maryland; 3) none of the alleged acts of extortion or murder took place outside the State or involved anyone outside of Maryland and 4) although the allegedly extortionate texts were routed outside the State, the offense could just as easily been committed without the calls being routed interstate.   The only possible ground for federal jurisdiction arises from the "use of an interstate facility" in that certain of the defendant's texts that were sent on a Cricket phone were routed outside of Maryland and then sent back to be received by Mr. Wutoh.   It is noted that Mr. Crawford used AT&T; Agent Wilde testified that AT&T did not rout its texts outside of Maryland.

An examination of the legal jurisdiction for count two must begin with an analysis of the statute and its goals.   At bottom, section 1952 was not intended to address isolated events that would otherwise be covered by state criminal laws: "Legislative history of the Act is limited, but does reveal that sec. 1952 was aimed primarily at organized crime and, more specifically, at persons who reside in one State while operation or managing illegal activities in another."   *Rewis v. United States*, 401 U.S. 808, 811 (1971).   That legislative history, albeit brief, is nevertheless telling.   Attorney General Robert Kennedy, who proposed the bill to Congress, testified before the Congressional committees that "the extent to which organized crime and racketeering have developed on an interstate basis convincingly [demonstrates] the need for new Federal laws." Senate Hearings 10-11; see House Hearings 19-20. See also H. R. Rep. No. 966, 87th Cong., 1st Sess., 2-3 (1961) (§ 1952).

Attorney General Kennedy went on to say that the bill addressed that such racketeers "use interstate commerce and interstate communications with impunity in the conduct of their unlawful activities. If we could curtail their use of interstate communications and facilities, we could inflict a telling blow to their operations. We could cut them down to size." Senate Hearings 11.   And that the bill was "designed to prohibit the use of interstate facilities for the conduct of the many unlawful enterprises which make up organized crime today." House Hearings 20. See also H. R. Rep. No. 966, 87th Cong., 1st Sess., 3 (1961) (§ 1952); H. R. Rep. No. 968, 87th Cong., 1st Sess., 2 (1961) (§ 1953).

Thus, although the "use" of a cell phone (an activity that could not have been anticipated in 1961 when the statute was passed) fits into the language of the statute, such expansive use of federal jurisdiction was not intended by this statute.   "In short,

nothing in the statutory language nor legislative history supports such a broad-ranging interpretation of section 1952." *Rewis* at 812. Indeed, as pointed out by the Seventh Circuit in *United States v. Isaacs*, 493 F.2d 1124, 1147 (7th Cir. 1974) "It would be the rare case where investigation of an enterprise in violation of state law would not disclose some incidental and fortuitous use of interstate facilities which might then be used to support a federal prosecution." The Court went on to state, in agreement with *Rewis* that "[n[othing in the legislative history supports such a broad reading of the statute." *Id*.

The law is clear, however, that there is " no requirement that the use of the interstate facilities be essential to the scheme: it is enough that the interstate travel or the use of interstate facilities makes easier or facilitates the unlawful activity. …. Conversely, where the use of interstate facilities or interstate travel has been deemed an essential part of the scheme, such use or travel cannot be considered "minimal," "incidental," or "fortuitous. *United States v. Wander*, 601 F.2d 1251, 1256 (3rd Cir. 1979) (internal quotations omitted.) *Wander* cited *Isaacs* for the proposition that "in certain circumstances, "the use of interstate facilities [will be] so minimal, incidental, and fortuitous, and so peripheral to the activities" of the defendants, that conviction under this Act will be barred." *Id*. The instant case presents just such a circumstance.

In *Isaacs*, the defendants were convicted of using interstate facilities to promote an extortion scheme in Illinois. Three of the payments in the scheme were made by check and those checks were routed through a bank in Missouri. The Court held that the travel by the checks from Illinois to Missouri would not support federal jurisdiction under section 1952. This interstate use was "incidental to the scheme; checks which would have cleared through Chicago, rather than through St. Louis

could just as easily have been utilized." *Id*. at 1148.   The Court cited a similar situation that arose in *United States v. Altobella*, 442 F.2d 301 (7th Cir. 1971) where the Court also found the interstate involvement to be too minimal to support a federal criminal prosecution: "[t]he use of the mails by the bank through which appellants' victim's check was cleared * * * was purely incidental to appellants' sordid scheme. Their purpose would have been achieved equally well if the victim had borrowed $100 from associates at the hotel or written a check on a local bank."  *Isaacs*, at 1147-1148, *quoting Altobella*, 442 F.2d at 315.   In sum the Court stated that "We cannot agree that the incidental use of a federally regulated banking facility furnishes the jurisdictional element of a § 1952 offense."  *Isaacs*, at 1149.

The Fourth Circuit case of *United States v. Wechsler*, 392 F.2d 344, *cert. den.* 392 U.S. 932 (1969) does not require a different conclusion.   Although in *Wechsler* the Court found that the cashing of out of state checks by a local druggist running a gambling operation would support a finding of jurisdiction.   In that case, however, the gambling operation catered to a large number of out of state clients, nearly all of whom were expected to, and did, pay using checks instead of cash.   Thus, in *Wechsler*, the illegal gambling activity could not have survived without the interstate activity of clearing the checks out of state.

Similarly, the *Wander* Court found sufficient support for federal jurisdiction even though only two phone calls were made out of state in the blackmail scheme.   In *Wander* the calls were critical to the completion of the offense: the blackmail involved arranging for the female defendant to lure the victim to a hotel so that compromising photos could be taken of the two, thus permitting the blackmail. Although initially all of the defendants lived in Pennsylvania, the female moved to Florida before the scheme reached fruition.   As a result, the Court held that the

female's"decision to move to Florida was unrelated to the planned motel incident. The extortion scheme could have been carried out without any interstate involvement had [she] remained in Pittsburgh. However, once [she] moved to Florida it became essential to the implementation of the defendants' scheme that they use interstate facilities to secure her presence in Pittsburgh." *Wander* at 1256.

In *Isaacs*, the Court prophetically anticipated precisely the issue in the instant case. *Isaacs* stated that "it would be the rare case where investigation of an enterprise in violation of state law would not disclose some incidental and fortuitous use of interstate facilities which might then be used to support a federal prosecution." *Isaacs* at 1147. It is indeed difficult to imagine any criminal case nowadays that would not involve, at some level, the use of a cell phone. If the mere use of a cell phone, without more, creates federal jurisdiction, then every State crime becomes a potential for a federal prosecution.

The use of interstate facilities in this case is not only incidental to the actual crime, it was entirely fortuitous. Agent Wilde testified that although Cricket routs its texts outside of Maryland, AT&T does not. The result of this testimony is that if Mr. Hightower had chosen an AT&T plan to send his texts, no matter how extortionate they were, his texts would not have left the State and federal jurisdiction would not exist; Harry Crawford used AT&T according to Agent Wilde.

Something as important as federal criminal jurisdiction cannot be dependent on a defendants random choice of a cell phone plan. The legislative history of section 1952 indicates that it was intended to combat organized crime and offenses in which defendants specifically involve multiple states in their crimes. Nothing in this case, except the technical "use" of an interstate facility, supports a 1952 prosecution - there is no organized crime, no intentional reliance on multiple states to commit the crime

and zero activity by the defendant outside of the State of Maryland. The routing of texts outside of Maryland was indeed "fortuitous". Count two should be dismissed entirely due to a lack of sufficient support for federal jurisdiction.

          Respectfully submitted,

          _____/s/_____

          Richard Bardos, Of Counsel
          Schulman, Hershfield & Gilden, P.A.
          1 East Pratt Street, Suite 904
          Baltimore, Maryland 21202
          (410) 332 0850
          Counsel for Matthew Hightower

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on this _16th_ of October, 2016, a copy of the foregoing Motion to for judgments of acquittal was served electronically to: Office of the United States Attorney, 36 South Charles Street, Fourth Floor, Baltimore, Maryland 21201 by electronic filing with the Court's ECM system.

          _____/s/_____
          Richard Bardos