

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
SOUTHERN DIVISION

MATTHEW HIGHTOWER,
    PETITIONER.

    V.

UNITED STATES OF AMERICA,
    Respondent.

CRIMINAL NO. GJH-15-322
CIVIL NO. GJH-19-1719

## MOTION FOR SENTENCING REDUCTION UNDER 18 U.S.C. § 3582(c)(1)(A)(i)

Matthew Hightower respectfully moves this Honorable Court to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A)(i), which allows such a reduction if the Court finds it warranted by "Extraordinary and Compelling Circumstances." Hightower seeks a reduction of his sentence to time served followed by five years of Supervised release.

### INTRODUCTION

Due to the first step act, a District Court can now grant compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) upon its own finding that relief is warranted by extraordinary and

-1-

Compelling Circumstances. Relief is warranted for Mr. Hightower for the following reasons:

1.) In light of the current pandemic, Hightower is at an extremely high risk of succumbing to the devastating effects of COVID-19 due to his underlying medical conditions. Hightower has type 2 diabetes, heart and kidney conditions for which he takes seven (7) different medications for. (See Attached Medical Records marked as EXHIBIT B ). Hightower is also african-american and, according to the C.D.C., this fact and his underlying chronic medical condition places him in a category of people severely and disproportionately affected by the novel coronavirus. Recently there has been a outbreak of COVID-19 at the institution Hightower is currently housed in. Because Hightower is especially vulnerable due to his compromised immune system, Hightower has a high risk of dying from, or, at the very least, suffering severely from COVID-19 and it's complications.

2.) Hightower originally received his sentence of 380 months due to the Government, by way of it's agents, deceptive, illegal and immoral practices of fabricating and falsifying evidence. These practices, as well as the practice of offering and allowing, as well as soliciting known, perjured testimony from "witnesses" has become the cultural norm in the specific office of the U.S. Attorney that prosecuted Hightower. (See EXHIBIT C ). If not for the

misconduct of the Assistant U.S. Attorney's (A.U.S.A.) and Agent of the F.B.I. and D.H.H.S., Hightower would not be convicted or sentenced for a crime he is innocent of.

## LIBERAL CONSTRUCTION STANDARD

Comes now, Matthew Hightower, hereinafter referred to as Hightower, proceeding pro se, and prays this Honorable Court applies liberal construction to the instant filing as afforded all pro se inmates/litigants. (See Haines v. Kerner, 404 U.S. 519 (1972)).

## BACKGROUND FACTS

Hightower was charged with extortion in violation of 18 U.S.C. § 894, and 2 (Count 1); and use of interstate facilities for extortion in violation of 18 U.S.C. § 1952, and 2 (Count 2).

Hightower proceeded to trial on a third superseding indictment before the Honorable Marvin J. Garbis on September 12, 2016, and on September 22, 2016, the jury returned a guilty verdict on both counts against Hightower.

On November 30, 2016, Hightower was sentenced to 380 months total. The Honorable Court also imposed a 5 year term of supervised release after Hightowers sentence.

-3-

Hightower noted a timely appeal on December 1, 2016. (Appeal No. 16-4796)

The Fourth Circuit Court of Appeals affirmed Hightower's conviction in an unpublished opinion. (*United States v. Hightower*, 714 Fed. Appx. 268 (4th Cir. 2018)).

In prison, Hightower has been nothing short of a model inmate. His progress report reflects his upstanding character, as well as his desire to thrive and actions towards improving himself and to continue his education, growth and development. (See Attached progress report and completed programs marked as EXHIBIT A-2).

Hightower is currently 39 years old and is aging quicker than the average person due to his being wrongfully convicted, the overwhelming stress that accompanies this fact and his underlying medical conditions adds more stress and strain to his body and psyche. Not to mention the fact that the Office of the Inspector General, hereinafter referred to as O.I.G., acknowledges that "an inmate's physiological age averages 10-15 years older than his or her chronological age", due partly to the "stress associated with incarceration." (See O.I.G., "The impact of an aging inmate populate on the Federal Bureau of Prisons" At 1-2 (February 2016)).

Hightower's medical records show that he is in need of daily medical care. He suffers from diabetes, for which he takes insulin shots twice daily as well as several other medications

-4-

help manage his heart and kidney functions. (See Medical Records marked as EXHIBIT B).

The pandemic and recent COVID-19 outbreak at Hightower's housing institution poses a serious threat to Hightower's life and health.

If Hightower were released, he would have a stable home and health-care situation. Hightower's home plan is to live with his fiancee - Miss Aurielle Washington - at 3311 Elgin Avenue, Baltimore, Maryland 21216 - who gladly welcomes Hightower. Miss Washington already agreed to add Hightower to her medical insurance plan to cover his medical/health care expenses, as well.

Also, if Hightower were released, Mr. Nijeeb Cassie, owner of N and N Towing, located at 3215 Lohrs Lane, Baltimore, MD 21229, has offered Hightower a position with his company once he is released to home confinement. Mr. Cassie runs a busy mechanical shop repairing cars, trucks, and tractor-trailers and assures Hightower stable employment to provide for himself and his family driving tow trucks for N and N.

In sum, Hightower was condemned to serve over 30 years for crimes he is completely innocent of committing. If not for the unthinkable misconduct of the prosecution, it's team of D.H.H.S. and F.B.I. agents and witnesses lies, Hightower would be home with his family today, which is where he belongs. Hightower is an

-5-

innocent man serving time for crimes he did not commit and, to add insult to injury, now is at serious risk of dying or suffering severe medical complications due to the current pandemic that is now at the very institution he is housed in.

## ARGUMENT

I. <u>This Honorable Court can resentence Hightower for the extraordinary and compelling circumstances presented here.</u>

   With the changes made to the compassionate release statute by the first step act, Courts need not wait for a motion from the B.O.P. to recommend reduction of a prisoner's sentence under 18 U.S.C. § 3582 (c)(1)(A)(i) - for "extraordinary and compelling reasons," and the reasons that can justify resentencing need not involve medical, age-related, or family circumstances.

   A. <u>When Congress enacted § 3582, it intended "extraordinary and compelling reasons" to include those other than medical, age-related, or family circumstances.</u>

   Congress first enacted the modern form of the compassionate release statute contained in 18 U.S.C. § 3582 as part of the comprehensive crime control act of 1984. Section 3582 (c) states that a District Court can modify even a final "term of imprisonment" in four situations, the broadest of which is directly relevant here. A sentencing Court can reduce a

sentence if and whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i) (2018). In 1984, Congress conditioned the reduction of sentences on the B.O.P. director filing an initial motion in the sentencing court; absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for extraordinary and compelling reasons.

Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under § 3582(c). But the legislative history gives an indication of how Congress thought the statute should be employed by Federal Courts. One of Congress' initial goals in passing the comprehensive crime control act was to abolish parole and create a "completely restructured guidelines sentencing system." (S. Rep. No. 98-225, at 52, 53 n.196 (1983).

Yet, recognizing that parole historically played a key role in responding to changed circumstances, the senate committee stressed how some individual cases may still warrant a second look at resentencing:

The committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which <u>other extraordinary and compelling circumstances justify a reduction of an unusually long sentence</u>, and some cases in which the sentencing guidelines for the offense of which

-7-

a defendant was convicted have been later amended to provide a shorter term of imprisonment. Id. at 55-56 (emphasis added). Rather than having the Parole Commission review every federal sentence focused only on an offender's rehabilitation, Congress decided that § 3582(c) could and would enable courts to decide, in individual cases, if "there is a justification for reducing a term of imprisonment[.]" Id. at 56.

Congress intended for the situations listed in § 3582(c) to act as "safety valves for modification of sentences," id. at 121, that enabled sentence reductions when justified by various factors that previously could have been addressed through the now-abolished parole system. This particular safety valve would "assure the availability of specific review and reduction to a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." Id. Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly compelling situations." Id.

Congress thus intended to give federal sentencing courts an equitable power that would be employed on an individualized basis to correct fundamentally unfair sentences. And there is no indication that Congress limited the safety valve of §3582 (c)(1)(A) to medical or age-related release; if extraordinary and compelling circumstances were present, they could be

-8-

used to "justify a reduction of an unusually long sentence,"
S. Rep. No. 98-225, at 55-56. Yet, by statute, the Courts
could act only upon motion of the Bureau of Prisons. 18 U.S.C.
§ 3582 (c)(1)(A) (2018).

 B. The Sentencing Commission concluded that "extraordinary
    and compelling reasons" include those other than medical,
    age-related, or family circumstances.

 Congress initially delegated responsibility for determining what
constitutes "extraordinary and compelling reasons" to the U.S.
Sentencing Commission ("Commission"). See 28 U.S.C. § 994 (t)
("The Commission ... shall describe what should be considered
extraordinary and compelling reasons for sentence reduction,
including the criteria to be applied and a list of specific
examples.") Congress provided only one limitation to that
delegation of authority: "[r]ehabilitation of the defendant alone
shall not be considered an extraordinary and compelling reason." Id
(emphasis added).

 Congress no doubt limited the ability of rehabilitation alone to
constitute extraordinary circumstances so that sentencing courts
could not use it as a full and direct substitute for the
abolished parole system. Congress, however, contemplated that
rehabilitation could be considered with other extraordinary
and compelling reasons sufficient to resentence people in
individual cases. Indeed, the use of the modifier "alone" signifies
just the opposite: that rehabilitation could be used in tandem

-9-

with other factors to justify a reduction.

   The Commission initially neglected it's duty, leaving the B.O.P. to fill the void and create the standards for extraordinary and compelling reasons warranting resentencing under § 3582 (c)(1)(A). In 2007, the Commission finally acted by promulgating a policy that extraordinary and compelling reasons includes medical, age-related and family circumstances, as well as other reasons." U.S.S.G. §1B1.13, application note 1 (A).

   After a critical DOJ Inspector General report found that the B.O.P. had rarely moved Courts for a § 3582 (c)(1)(A) modification, even for prisoner's who met the objective criteria, See U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prison's Compassionate Release Prison program at i - iv (Apr. 2013) ("FBOP Compassionate Release Program"), the Commission amended its policy statement, expanding the guidance to Courts on qualifying conditions and urging the B.O.P. to file motions for compassionate release whenever a prisoner was found to meet the objective criteria in U.S.S.G. §1B1.13. (U.S.S.G. § 1B1.13, comment. n.4 ; See also United States v. Dimasi, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the O.I.G. report to new "encouraging" guidelines)).

   The Commission created several categories of qualifying reasons: (A) "Medical Conditions of the defendant," including terminal illness and other serious conditions and impairments; (B) "Age of the defendant," for those 65 and older with serious

deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment; (C) "Family Circumstances," where a child's caregiver or spouse dies or becomes incapacitated without an alternative caregiver; and (D) "Other Reasons," when the Director of the B.O.P. determines there is "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13, Comment. n.1.

The Commission also clarified that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." U.S.S.G. § 1B1.13, comment. n.2. In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction." Id.

Consistent with the text and legislative history of § 3582(c), the Commission concluded that reasons beyond medical, age-related, and family circumstances could qualify as "extraordinary or compelling reasons" for resentencing, and that the extraordinary or compelling reasons need not be based on changed circumstances occurring after the initial sentencing of the defendant. Yet that catch-all provision was – consistent with the statutory requirement for a B.O.P. motion – still tied to B.O.P. endorsement. U.S.S.G. § 1B1.13, Comment. n. 1 (D).

-11-

C. Through the First Step Act, Congress removed the requirement that the B.O.P. endorse requests for Compassionate Release.

As indicated above, prior to Congress passing the First Step Act, the process for compassionate release under § 3582(c)(1)(A), and the only way a sentencing court could reduce a sentence was if the B.O.P. Director initiated and filed a motion in the sentencing court. See 18 U.S.C. § 3582(c)(1)(A) (2018). If such a motion was filed, the sentencing court could then decide whether "the reduction was justified by 'extraordinary and compelling reasons' and was consistent with applicable policy statements issued by the Sentencing Commission." Id. So even if a federal prisoner qualified under the Commission's definition of extraordinary and compelling reasons, the sentencing court had no authority to reduce the sentence absent a motion from the B.O.P., and the prisoner was unable to secure a sentence reduction.

This process meant that, for all practical purposes, the B.O.P. Director both initiated the process and set the criteria for whatever federal prisoner's circumstances the Director decided to move upon.

Leaving the B.O.P. Director with ultimate authority for triggering and setting the criteria for sentence reductions under § 3582(c)(1)(A) created several problems. The Office of the Inspector General found that the B.O.P. failed to provide adequate guidance to staff on the criteria for compassionate release, to set time lines for

-12-

reviewing compassionate release requests, to create formal procedures for informing prisoners about compassionate release, and to generate a system for tracking compassionate release requests. See FBOP Compassionate Release Program, at i - iv.

As a result of these problems, the O.I.G. concluded that "B.O.P. does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." Id.; see generally Stephen R. Sady and Lynn Deffebach, Second Look Resentencing under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies That Result in Overincarceration, 21 FED. SENT. RPTR. 167 (Feb. 2009).

Congress heard those complaints. In December 2018, Congress passed the First Step Act, part of which transformed the process for compassionate release under § 3582 (c)(1)(A). See P.L. 115-391,132 Stat. 5194, at § 603 (Dec. 21, 2018). Section 603 of the First Step Act changed the process by which § 3582(c)(1)(A) compassionate release occurs: instead of depending on the B.O.P. Director to determine an extraordinary circumstance and then move for release, a court can now resentence "upon motion of the defendant," if the defendant has fully exhausted all administrative remedies, "or lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582 (c)(1)(A).

Once the defendant, after exhausting the B.O.P. remedy, files a motion, a court may, upon considering the 18 U.S.C. § 3553(a)

-13-

factors, resentence a defendant, if the court finds that extraordinary and compelling reason warrant a reduction. Id. Any reduction of a sentence that a court orders must also be "consistent with applicable policy statements issued by the Sentencing Commission." Id. The effect of these new changes is to allow federal judges the ability to move on a prisoner's compassionate release application even in the face of B.O.P. opposition or its failure to respond to a prisoner's request for compassionate release in a timely manner.

Congress made these changes in an effort to expand the use of compassionate release sentence reductions under § 3582(c)(1)(A). Congress labeled these changes, "Increasing the Use and Transparency of Compassionate Release". 164 Cong. Rec. H10346, H10358 (2018) (emphasis added). Senator Cardin noted in the record that the First Step Act made several reforms to the federal prison system, including that "[t]he bill expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. Rec. S7753, S7774 (Dec. 18, 2018) (emphasis added). In the House, Representative Nadler noted that First Step included "a number of very positive changes, such as ... improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. Rec. H10346-04, 164 Cong. Rec. H10346-04, H10362 (Dec. 20, 2018)(emphasis added).

Federal judges now have the power to order reductions of sentences even in the face of B.O.P. resistance or delay in the processing of applications. The legislative history leading up to the enactment of

-14-

the First Step Act established that Congress intended the judiciary not only to take on the role that B.O.P. once held under the pre-First Step Act compassionate release statute as the essential adjudicator of Compassionate release requests, but also to grant sentence reductions on the full array of grounds reasonably encompassed by the "extraordinary and Compelling" standard set forth in the applicable statute.

   D. <u>In light of the First Step Act, the district court can decide, without the endorsement of the B.O.P., what amounts to extraordinary and Compelling Circumstances.</u>

Once a prisoner has properly pursued administrative remedies and filed a motion for Compassionate release, a federal court possesses authority to reduce a sentence if and whenever the Court finds "extraordinary and Compelling reasons warrant such a reduction." A Court must consider the 18 U.S.C. § 3553(a) sentencing factors in reducing any sentence, and any reduction of a sentence that a Court orders must also be "Consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582 (c)(1)(A).

As noted above, the Sentencing Commission created a catch-all provision for Compassionate release under U.S.S.G. § 1B1.13, application note (1)(D), which states:

     Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case

-15-

an extraordinary and compelling reason other than,
or in combination with, the reasons described in
Subdivisions (A) through (C).

The Commission also stated the process by which compassionate
release reductions should be decided:

Motion by the Director of the Bureau of Prisons. —
A reduction under this policy statement may be
granted only upon motion by the Director of the
Bureau of Prisons pursuant to 18 U.S.C. § 3582 (c)(1)(A).

U.S.S.G. § 1B1.13, comment. n.4.

The dependence on B.O.P. in these policy statements is a relic of
the prior procedure that is now inconsistent with the First Step Act's
amendment of § 3582 (c)(1)(A). Application note 1 (D) can no longer
limit judicial authority to cases with an initial determination
by the B.O.P. Director that a prisoner's case presents extraordinary
or compelling reasons for a reduction, because the First Step Act has
expressed allows Courts to consider and grant sentence reductions
even in the face of an adverse or unresolved B.O.P. determination
concerning whether a prisoner's case is extraordinary or compelling.
See 18 U.S.C. § 3582 (c)(1)(A), as amended by Pub. L. 115-391 § 503
(Dec. 21, 2018). And the Commission's now-dated statement
indicating that the B.O.P. must file a motion in order for a Court to
consider a compassionate release sentence reduction no longer
controls in the face of the new statutory text enacted explicitly

-16-

to allow a Court to consider a reduction even in the absence of a B.O.P. motion. Id. With the First Step Act, Congress decided that federal judges are no longer constrained or controlled by how the B.O.P. Director sets its criteria for what constitutes extraordinary and compelling reasons for a sentence reduction.

Consequently, those sections of the application notes requiring a B.O.P. determination or motion are not binding on Courts. See <u>Stinson v. United States</u>, 508 U.S. 36, 38 (1993) ("We decide that commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.")

Put differently, now that the First Step Act has recast the procedural requirements for a sentence reduction, even if a Court finds there exists an extraordinary and compelling reason for a sentence reduction without the B.O.P. Director's initial determination, then the sentence reduction is not inconsistent "with the applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582 (c)(1)(A).

Accordingly, the court in <u>United States v. Cantu</u>, 2019 WL 2498923 (S.D. Tex. June 17, 2019) held that it could reduce a prisoner's sentence upon finding "extraordinary and compelling circumstances" under Subsection (D) - the policy statements catch-all category - even though the B.O.P. had not endorsed the finding. The Cantu court explained that Subsection (D)'s

-17-

requirement for B.O.P. endorsement conflicts with the new statutory directive of the First Step Act, which denies the B.O.P. that role:

> Before the First Step Act's amendments to § 3582, it made sense that the B.O.P. would have to determine any extraordinary and compelling reasons — only the B.O.P. could bring a motion for a reduction of sentence under § 3582(c)(1)(A). But defendants no longer need the blessing of the B.O.P. to bring such motions. The B.O.P. in fact may never weigh in or provide guidance when a § 3582(c) motion is brought by a defendant. Cf. DeLuca v. Lariva, 586 F App'x 239, 241 (7th Cir. 2014) ("[W]hile the B.O.P.'s interpretive Program Statement lists some factors the Bureau may consider in determining whether to move for compassionate release, the policy-statement is non-exhaustive."). Given the changes in the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582 (c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582.

> Id. at *4 (emphasis in original).

Thus, it is consistent with the valid aspects of the policy

-18-

statement found at U.S.S.G. § 1B1.13 for the district courts to determine, absent endorsement from the B.O.P., what amounts to extraordinary and compelling circumstances under the Catch-all provision, Subsection D.

Finally, the foregoing argument assumes arguendo that the policy statements issued in U.S.S.G. § 1B1.13 have the binding force of law on federal courts. (See generally Dillon v. United States, 560 U.S. 817, 830 (2010) (holding that the policy statements issued in U.S.S.G. § 1B1.10 are binding where they were issued pursuant to the Commission's statutory authority in 28 U.S.C. § 994(u) to set boundaries on sentence reductions). But, it bears noting that it seems that these mere "policy statements" were never intended to have the binding force of law.

When authorizing these policy statements, Congress merely directed the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t) (emphasis added). Like "policy statements" in other areas of administrative law, it appears that the policy statements to be issued under § 994(t) — which could be a issued without following any quasi-legislative, notice-and-comment process — were intended to serve as mere advice to courts by identifying relevant factors to be considered when balancing all the circumstances presented in an individual case. Pacific Gas & Electric Co. v. Federal Power Commission, 506 F.2d 33, 38 (D.C. Cir. 1974) (explaining that

an agency's policy statements are "informational devices," not "binding norm[s]"); <u>Vietnam Veterans of America v. Secretary of the Navy</u>, 843 F. 2d 528, 537 (D.C. Cir 1988) ("[a] binding policy is an Oxymoron").

Thus, it is especially clear that it would be inappropriate for the commission to decree through a mere, "policy statement" that the B.O.P. has the power to trump the judgment of the Court — even after Congress has taken precisely that power away from the B.O.P..

In Sum, like the Court in Cantu, this Court should conclude that it can determine what amounts to extraordinary and compelling circumstances.

E. <u>HIGHTOWER'S CASE PRESENTS EXTRAORDINARY</u>
<u>AND COMPELLING CIRCUMSTACES</u> ①

Two extraordinary circumstances combined in Hightower's case to justify a sentence reduction under § 3582(c)(1)(A).

i.) <u>Hightower's compromised immune system, underlying</u>
<u>medical conditions, and the fact that he is african</u>
<u>american put him at a high risk of death or severe</u>
<u>medical complications should he contract the</u>

① Hightower has exhausted his administrative remedies. (See EXHIBIT A-1).

-20-

## COVID-19 VIRUS THAT HAS RECENTLY SPIKED AT
## THE INSTITUTION HIGHTOWER IS HOUSED IN

As this Honorable Court knows, the COVID-19 pandemic has upended life as we know it, claiming more than 280,000 american lives, and causing illness and death in our nation's prisons. Although the B.O.P. has taken laudable steps to contain the Coronavirus in federal prisons, prisons "have inherent difficulties in enforcing the type of social distancing and hygiene regimen necessary to control the spread of the novel Corona-virus." (See United States v. Hopson, 2020 WL 2739533, at *6 (D.C. Sup. Ct. May 22, 2020). (See also, http://www.cdc.gov/coronavirus/2019-NCOV/community/correction-detention/faq.html ("people in Correctional and detention facilities are at greater risk for some illnesses, such as COVID-19, because of close living arrangements with other people.")). And the B.O.P. is already stretched to its operational and logistical limits in seeking to mitigate a disease that "spreads like wildfire." This fact has recently been realized at F.C.I. Hazelton, where Hightower is housed, with a COVID 19 outbreak amongst both inmates and staff alike. Due to his type 2 diabetes, heart and kidney problems, all "underlying chronic conditions", Hightower faces a heightened risk of dying or being seriously injured by COVID-19.

Diabetics and those with chronic heart and kidney illnesses are immuno compromised to a significant degree. Moreover, recent data shows that men are at greater risk of contracting severe illness as a result of COVID-19 and are twice as likely as women to die from the virus. (See Roni Caryn Rabin, in N.Y.C., the Coronavirus is killing men at twice the rate of women, N.Y. Times (Apr. 7, 2020)).

Considering Hightower's family history and his having type 2

diabetes, Hightower is at an "elevated risk" of severe illness and, or death from COVID-19 infection, per C.D.C. Guidelines. A fact made more relevant and probable with the recent death of Hightower's first cousin Terrence Mitchell from COVID-19, as a result of his underlying medical condition of type 2 diabetes. Also, Hightower's mom - in 2006 - passed away from complications of type 2 diabetes.

Reconizing the dire reality inmates like Hightower face, Attorney General William Barr issued a memorandum for the Director of the Federal Bureau of Prison's on March 26, 2020, titled "prioritization of home confinement as appropriate in response to COVID-19." In said memorandum, the U.S. Attorney recognizes the risk to inmates like Hightower's life, health, and safety COVID-19 poses. As a result, the Attorney General has taken the unprecedented step of personally reaching out to the Director of the Bureau of Prisons in an attempted to help save the lives and health of vulnerable inmates like Hightower.

Unfortunately, as Hightower has highlighted herein above, the Director has taken no action or little if any, to release eligible inmates to home confinement, Nor has the B.O.P. Director sought, by motion, to the Courts to have eligible and vulnerable inmates released under compassionate release.

As stated above, along with his underlying type 2 diabetes and kidney illness, Hightower has a heart condition that, should he suffer any serious cardiac problem which most likely will arise if he contracts the COVID-19 virus, F.C.I

Hazelton is not equipped to handle any serious cardiac problems. If released to the residence in Baltimore as he requests, Hightower would be minutes away from such highly rated Hospitals as Johns Hopkins Hospital, The University of Maryland Medical Center, and Sina Sinai Hospital of Baltimore.

Since the COVID-19 outbreak, and since the recent spike of cases at Hightower's institution, Hightower's terms of incarceration are much more onerous than anticipated by this Honorable Court at the time of Sentencing. F.C.I. Hazelton is on lockdown due to COVID-19; Hightower is currently confined to his cell 24 hours a day, 7 days a week with the exception of coming out of his cell for a ten minute shower on Monday, Wednesday, and Friday.

Prior to the outbreak of COVID-19 at his institution, Hightower was confined to his cell 22 hours a day Monday through Friday and 24 hours a day Saturday and Sunday. Meals are served cold or in boxes in his cell. No programs are offered and visits from family and friends are prohibited.

As evident from studies, these conditions take a psychological toll on a person and contribute to the decline in one's health. In Hightower's case, with his already chronic medical conditions, this further increases his risk of death or severe medical complications and damage should he contract COVID-19 that is present at the institution he is

-23-

Confined in. As the Honorable Court Judge Chuang has pointed out, being incarcerated during the COVID-19 outbreak has "sufficiently increased the severity of the sentence beyond what was originally anticipated." United States v. Mel, Crim. No. TDC-18-571, 2020 WL1041674 (D. Md., April 28, 2020)

Part of the extra-ordinary and compelling reasons that justify Hightower's release from prison is the medical conditions he suffers from, namely type 2 diabetes, heart and kidney conditions that he takes 7 different medications for on a daily basis including insulin shots. Conditions for which Courts have granted compassionate release in recognition of the potentially deadly outcomes posed by COVID-19.

In particular, these conditions pose increased risk in a facility with ongoing cases of COVID-19.

Courts around the Country have found extraordinary and compelling reasons "supporting release on the basis of a combination of dire prison conditions and underlying health conditions that increase the likelihood of severe illness from COVID-19," United States v. White   F. Supp. 3d   , 2020 WL 3244122, at *3 (S.D. W. Va. June 12, 2020)(collecting cases). (See also United States v. Compagna,   F. Supp. 3d   , 2020 WL 1489829, at *3 (S.D. N.Y. Mar. 27, 2020)("[D]efendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify to defendant's sentence ...");

-24-

_Stephenson_, 2020 WL 2566760, at *5-6; _United States v. Rodriguez_, F. Supp. 3d ___, 2020 WL 1627331, at *5 (E.D. Pa. April 1, 2020); _United States v. Guzman Soto_, 2020 WL 2104787, at *2 (D. Mass. May 1, 2020)).

The CDC has made abundantly clear that anyone who is immunocompromised is at higher risk of negative health outcomes upon contracting COVID-19. Even the General Social distancing and hygiene recommendations are "difficult if not impossible" to implement in the prison environment, let alone the enhanced protocols recommended for individuals, like Hightower, who are especially vulnerable to infection and serious illness from COVID-19. (_Rodriguez_, F. Supp. 3d ___, 2020 WL 1627331, at *8 ("Many of the recommended measures to prevent infection are impossible or unfeasible in prison")).

Again, diabetes is a serious risk factor for COVID-19, and Courts have even granted compassionate release for "pre-diabetic" inmates. (See, e.g. _United States v. Coles_, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020)). (Being "pre-diabetic" "increase[s] the serious risks of COVID-19"); (See also _Cotton v. United States_, 2020 WL 3488752, at *3 (E.D. Mich. June 26, 2020); (_United States v. Blye_, 2020 WL 3064225, at *4 (W.D. Wash. June 9, 2020)).

The rationale is simple: A blood sugar level that qualifies an inmate as prediabetic is "enough to make him vulnerable to illness as a result of COVID-19," _Cotton_, 2020 WL 3488752,

at *3. These rulings are regarding "Prediabetic" inmates which means those inmates like Hightower who have actual type 2 diabetes are at the greatest risk and even greater than those prediabetic inmates spoken about in the above quoted/cited cases.

Therefore, it is no surprise that, when an immuno compromised inmate is detained at a facility where COVID-19 is present and an inevitable risk, as is the case for Hightower, Courts have given decisive weight to the "potentially Catastrophic Consequences" posed to inmates with medical conditions. (See United States v. Sawicz,   F. Supp. 3d   , 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020), holding that even just another "30 days" of living in a prison with ongoing cases "would put [defendants] at significant risk of suffering catastrophic health consequences".); (United States v. Barber, 2020 WL 2404679, at *3 (D. Or. May 12, 2020) (Noting that prison conditions make it impossible to "adequately follow social distancing and sanitary guidelines recommended to avoid the spread of infection.")

The threat of COVID-19 is a real and present danger at Hightower's facility with multiple confirmed cases at the time of this writing. Given the potentially deadly consequences of continued confinement, Courts have chosen "Not [to] brush off [the risk of COVID] as just another downside of prison", and have frequently granted release in the face of even just a few active COVID cases, understanding prison conditions will further accelerate the spread of the highly contagious virus.

-26-

_Stephenson_, 2020 WL 2566760, at *5. Indeed, even where just
one prison staff member tested positive at the time of the motion,
a Court granted relief as the single infection "demonstrate[d]
that even a federal medical facility is unable to keep the virus
outside of its walls." Id.

The fact that Hightower is now in direct threat of infection
places the danger posed by his medical conditions into stark
relief and positions this motion squarely among those already
granted by numerous Courts. See e.g., _White_, 2020 WL
3244122, at *6.

Hightower's medical and prison records constitutes
extraordinary and compelling reasons to grant compassionate
release. His type 2 diabetes, heart and kidney conditions render
him acutely vulnerable to serious illness and death from COVID-19,
and he is currently in a facility battling the global pandemic
within its walls.

> 2.) _Hightower is an innocent man who was convicted
> and sentenced for a crime he did not commit as
> a result of illegal, unethical misconduct in the
> practices and procedures that seem to be the
> culture at the specific U.S. Attorney's office
> that prosecuted Hightower._

As Hightower stated herein above, he was charged, tried
by a jury, convicted, and sentenced to a total of 380

-27-

months for the crimes of extortion in violation of 18 U.S.C. §894, and 2; use of interstate facilities for extortion in violation of 18 U.S.C. § 1952, and 2. Hightower exercised his right to a jury trial because he is innocent of the charges and he maintains his innocence.

Hightower not only accuses the U.S. Attorney's office for the District of Maryland, Northern Division, of misconduct, falsifying evidence, soliciting and allowing perjured testimony, and withholding exculpatory evidence by way of it's agents, i.e., Special agents Clarence Holiday and Mathew Wilde, and Government witness Zantia Jones, but Hightower has documented proof of his allegations.

Also, Assistant U.S. Attorney Sandra Wilkinson, who was the supervisory Attorney overseeing Hightower's prosecution, had a case identical to that of Hightower's, dismissed – with prejudice for the same misconduct her office and agents committed against Hightower. The case is captioned <u>United States v. Annappareddy</u>, No. 1:13-cr-00374 (D. Md.).

U.S. District Judge George L. Russell III called the actions federal prosecutors out of that office and working along with A.U.S.A Sandra Wilkinson improper and said they "Shock the conscience of this court." Ultimately, the case against Mr. Annappareddy was dismissed, with prejudice due to the misconduct of A.U.S.A Sandra Wilkinson and her agents.

-28-

Hightower highlights the specific misconduct committed by the Government through it's agents and witnesses herein. He also provides documented evidence to support his claims – as well as to demonstrate how this misconduct is not a first – and appears to be a pattern of the culture established, enforced, and encouraged at this one particular U.S. Attorney's Office in Baltimore, Maryland.

The allegations and supporting evidence is as follows:

1.) A.U.S.A. Sandra Wilkinson, A.U.S.A. Aaron Simcha Jon Zelinsky, A.U.S.A. Judson T. Mihok, and Detective Sekou Hinton of Baltimore County Police Department, falsified call detail records (CDR's) alleged to be obtained from T-Mobile U.S.A., Inc., then used the ficticious version of CDR's to frame Hightower in trial. Here's proof for instance:

   a. Special Agent Clarence Holiday (Agent Holiday) used the phony version of T-Mobile CDR's to produce Government summary trial exhibit 40, hereinafter Exhibit 40; and (See EXHIBIT No. 1, at **18 – 18.14**

   b. Special Agent Mathew Wilde (Agent Wilde) used the phony set of T-Mobile CDR's to produce Government summary trial exhibit 50 - the maps, hereinafter referred to as Exhibit 50. (See EXHIBIT No. 1, at **20 – 20.8**

2.) Baltimore County Police Detective Sekou Hinton testified in trial that he issued T-Mobile a subpoena then obtained the CDR's from T-Mobile used to create Exhibits 40 and 50 – before they were used

-29-

against Hightower.

3.) Both Government Summary trial exhibits 40 and 50 - the maps are false evidence because these exhibits create false impressions of material facts and also because said exhibits were both generated by Agent Holiday and Agent Wilde with fabricated T-Mobile CDR's.

4.) A.U.S.A. Zelinsky introduced the fabricated evidence contained in Governments exhibits 40 and exhibit 50 to the jury with at least 30 material lies during Hightower's trial. The 30 misrepresentations consists of 3 made in Governments opening statement, and 27 more throughout trial when A.U.S.A. Zelinsky solicited significant false testimony from Government witnesses Agent Holiday, Agent Wilde, and Ms. Zantia Jones. For instance:

I. GOVERNMENTS OPENING STATEMENT - 3 MATERIAL LIES TO THE JURY

    a. "Then in early August (2013), for the first time, the defendant began texting Dave (Mr. Wutoh) directly rather than working through Crawford." (See EXHIBIT No. 1), at **27**

    b. "Dave asked for more time, and the defendant told him the original deal, $15,000 for $20,000 a short time later had now changed. There was a turbo, an added interest payment of $3,000. For a $15,000 loan that had been made in the

Spring, the defendant was now demanding a total repayment, including what had already been paid, of $24,000."
(See EXHIBIT No. 1), at **27**

c. "Then on September 20th, 2013, ... the defendant arranged to buy a truck in cash. When he picked up the truck the following day, September 21, 2013, he asked the seller if he could keep the old license plate tags on it just for a night and he would return them the next day. She declined... And so he took the truck with no tags on it."
(See EXHIBIT No. 1), at **27.1**

5.) During trial, to bolster his own lies introduced to the jury, A.U.S.A. Zelinsky solicited the following materially false testimony from Government witnesses Agent Holiday and Ms. Zantia Jones (Ms. Jones), for instance :

II. SOLICITATION OF FALSE/PERJURY TESTIMONY BY AUSA ZELINSKY

a. Agent Holiday testified falsely to the false evidence in Exhibit 40, that Hightower texted Mr. Wutoh for the first time on August 2, 2013, at 10:45 a.m..
(See EXHIBIT No. 1), at **18.3**

b. Agent Holiday testified falsely to the false evidence in Exhibit 40, that on August 2, 2013, at 9:30 p.m., Hightower texted Mr. Wutoh saying he did not want any

-31-

added interest and that he "ONLY" wanted to be paid for the $9,000 balance owed, then Agent Holiday lied by saying 14 minutes later, at 9:44 p.m., Hightower took back his word by demanding a $3,000 - extortionate interest increase and asked for $12,000.
(See EXHIBIT No. 1), at **18.4**

c. Ms. Jones testified falsely that on Saturday, September 21, 2013, Hightower asked her - because "he could not get tags for his new truck" - to keep her old tags on the truck overnight until Sunday, September 22, 2013, which also happened to be the day of Mr. Wutoh's killing.
(See EXHIBIT No. 1), at **66.7**

6.) Official T-Mobile CDR's for Hightower's account and the expert testimony of Agent Wilde to Government exhibit 50 - the maps, all prove that the Government knowingly created false impressions of material facts for the jury to consider, and further prove that A.U.S.A. Zelinsky knowingly allowed and solicited the false testimony of Agent Holiday and Ms. Jones to go uncorrected during trial. For instance:

III. GOVERNMENT KNOWINGLY INTRODUCED 3 MATERIAL LIES TO JURY

a. In stark contrast to the opening statement lie of A.U.S.A. Zelinsky and the supporting false testimony of Agent Holiday - that Hightower texted Mr. Wutoh - allegedly for the first time on August 2, 2013, the Official

-32-

T-Mobile CDR'S for Hightower's account prove that:

  1. the first time Hightower ever texted Mr. Wutoh was
     on May 6, 2013, at 11:50 p.m., "NOT" on August 2, 2013,
     at 10:45 a.m., as alleged by the Government.;
     (See EXHIBIT No. 1), at **22.5**

  2. Hightower "always" texted Mr. Wutoh "directly" and
     "never" once through Mr. Crawford; and
     (See EXHIBIT No. 1) at **22.5 - 22.52**

  3. During the entire course spanning the alleged scheme
     of extortion, Mr. Wutoh and Hightower had 617 text
     messages total and had 510 texts "before" August 2,
     2013, - "NOT" zero as alleged by the Government.
     (See EXHIBIT No. 1), at **22.5 - 22.40**

b. In contrast to the opening statement (ie A.U.S.A.
   Zelinsky and the supporting false testimony of Agent
   Holiday to Exhibit 40, the official T-Mobile CDR'S for
   Hightower's account, as well as the trial testimony of
   Agent Holiday - testifying as defense witness - both prove
   that:

  1. Hightower "never" texted Mr. Wutoh on August 2, 2013,
     at 9:44 p.m., or any other time, to demand an
     extortionate loan interest increase of $3,000 as
     alleged by the Government. (See EXHIBIT No.1), at
     **22.41**

-33-

2. Agent Holiday omitted a 9:32 p.m. reply text on from Mr. Wutoh to Hightower, when he created Government trial Exhibit 40 and replaced it with the phony 9:44 p.m. message - alleged to be from Hightower to Wutoh. (See EXHIBIT No.1), at **22.41**

3. Agent Holiday admitted when testifying for defense, that Hightower "never" sent the August 2, 2013, 9:44 p.m. text demanding any $3,000 extortionate increase in interest. (See EXHIBIT No.1), at **19.8 - 19.11**

4. A.U.S.A. Zelinsky - after Agent Holiday's admission that the false text was "not" sent by Hightower, still allowed the lie to pass - without correcting it. Then, to make matters extensively worse, A.U.S.A. Sandra Wilkinson and A.U.S.A. Judson T. Mihok used the false evidence in the Government's appellee brief in Hightower's direct appeal. (See ~~EXHIBIT No.1), at~~ **Appeal: 16-4796, Doc. 76, at Pg: 21 of 59 and pg: 22 of 59**

C. In Contrast to the opening statement lie of A.U.S.A. Zelinsky and the supporting false testimony of Ms. Jones, that on the afternoon of Saturday, September 21, 2013, Hightower allegedly, was with her at her house (3913 Barrington Rd.) asking her to hold her license plates (tags) overnight, Government expert witness - agent Wilde's

testimony to the maps in Exhibit 50 prove:

1. Hightower was never at or near Ms. Jones' house on the entire afternoon of Saturday, September 21, 2013, to be able to ask her for anything. In fact, agent Wilde's expert testimony placed Hightower in a whole different area that entire afternoon.
(See EXHIBIT No.1) at **20.2 - 20.5**

7.) In addition to the 3 critical lies introduced to the jury through the Governments opening statements and false testimony of its witnesses, A.U.S.A Zelinsky continued the Governments pattern of misconduct with 27 more fallacies, including 7 by Agent Holiday, 8 by Ms. Jones, and 12 by Government expert witness, Agent Wilde which related to Hightower's alleged whereabouts in the critical hours before the death of Mr. Wutoh. For instance:

IV. 7 MATERIAL LIES BY AGENT HOLIDAY THROUGHOUT TRIAL

AGENT HOLIDAY - Agent Holiday testified falsely that a jail call from Mr.
LIE # 1          Davon Carter to Hightower on May 18, 2013, at 9:03 a.m,
                 was a discussion between the men over a loan to
                 Mr. Wutoh.
                 (See EXHIBIT No.1), at ~~23323~~ 18

THE TRUTH - Official T-Mobile CDR's prove Exhibit 40 is false evidence and that Agent Holiday testified falsely to it, because T-Mobile

documented that the May 18, 2013, 9:03a.m. call, was a
3-way Conference call between Hightower, Mr. Carter,
and another individual, So there is no way the two men
were discussing a loan to Mr. Wutoh.
(See EXHIBIT No.1), at **22.53**

AGENT HOLIDAY - Agent Holiday testified falsely that Mr. Crawford sent
LIE # 2            two texts to Mr. Wutoh during a dispute they
                   were having over an individual named Dave Dalton-
                   on June 11, 2013, at 2:09 p.m. and 4:35 p.m. .
                   (See EXHIBIT No.1), at **18.1 - 18.2**

THE TRUTH - At 2:08 p.m. and 4:25 p.m. on June 11, 2013, Hightower
           and Mr. Crawford were actually having a dispute with
           each other over Mr. Wutoh and Crawford later-had
           forwarded the 2:09 p.m. and 4:35 p.m. texts to Wutoh.

           The text messages extracted from Mr. Crawfords cell
           phone by the Government 2 years before Hightower's
           trial, reveal facts that prove once more that Exhibit 40
           is false evidence and that Agent Holiday falsely testified
           to it.
           (See EXHIBIT No.1), at **101 - 101.5**

AGENT HOLIDAY - Agent Holiday testified falsely that from September 5,
LIE # 3           2013, through September 19, 2013, during the days
                  leading up to Mr. Wutoh's death, Hightower allegedly

-36-

followed up a series of "missed calls" to Mr. Wutoh with
a pattern of "8 BLANK MESSAGES" right afterwards.
(See EXHIBIT No.1), Government Exhibit 40 at : **18.9-18.13**

page 19, (lines 220, 224, 228;

page 20, (lines 234, 242;

page 21, line 253;

page 22, line 261; and

page 24, line 290.

THE TRUTH — Official T-Mobile CDR's for Hightower's account prove that
Exhibit 40 is false evidence and Agent Holiday testified
falsely to it, because Hightower "never sent any" of the
8 phony "BLANK MESSAGES" to Mr. Wutoh in September
2013, as alleged by the Government.
(See EXHIBIT No.1), T-Mobile CDR's at : **22.50-22.52**

page 33 of 48, September 5, 2013, at 6:19p.m., 8:20p.m.
September 6, 2013, at 8:20a.m., 6:59p.m.;
page 32 of 50, September 9, 2013, at 8:52a.m.
September 13, 2013, at 8:52a.m.;
page 33 of 50, September 16, 2013, at 12:29 p.m.
September 19, 2013, at 3:54 p.m. .

-37-

AGENT HOLIDAY - Agent Holiday testified falsely that on September 5,
LIE #4        2013, at 6:19p.m., Hightower had placed a call
              to Mr. Wutoh.
              (See EXHIBIT No.1), at 18.9

THE TRUTH - Official T-Mobile CDR's for my account Hightower's
            account prove that Exhibit 40 is false evidence and
            agent Holiday testified falsely to it, because Hightower
            "never" call Mr. Wutoh on September 5, 2013, at 6:19p.m.
            (See EXHIBIT No.1), at 22.50

AGENT HOLIDAY - Agent Holiday testified falsely that on September 9,
LIE #5        2013, Hightower received a call from Mr. Crawford
              at 12:06p.m.
              (See EXHIBIT No.1), at 18.11

THE TRUTH - Official T-Mobile CDR's for my Hightower's account
            prove that Exhibit 40 is false evidence and Agent
            Hightower Holiday testified falsely to it, because
            Hightower did not received any calls on September 9,
            2013, from Mr. Crawford at 12:06p.m.
            (See EXHIBIT No.1), at 22.54

AGENT HOLIDAY - Agent Holiday testified falsely that on September 16,
LIE #6        2013, at 7:38p.m., Hightower call Mr. Wutoh twice.
              (See EXHIBIT No.1), at 18.12

THE TRUTH - Official T-Mobile CDR's for Hightower's account prove

-38-

that Exhibit 40 is false evidence and Agent Holiday testified falsely to it, because on September 16, 2013, Hightower "ONLY" called Mr. Wutoh once at 7:38 p.m. . (See EXHIBIT No. 1), at **22.4**

_AGENT HOLIDAY_ - Agent Holiday testified falsely that on September 19, _LIE # 7_  2013, at 3:54 p.m., Hightower followed up 2 calls to Mr. Wutoh with a "BLANK MESSAGE" to him as well. (See EXHIBIT No. 1), at **18.13**

THE TRUTH - Official T-Mobile CDR's for Hightower's account prove that Exhibit 40 is false evidence and Agent Holiday testified falsely to it, because Hightower "never" texted Mr. Wutoh on September 19, 2013 - ALL day. (See EXHIBIT No. 1), at **22.52**

8.) T-Mobile CDR's are-in-fact, the heart of the Government's case-in-chief against Hightower. Therefore, all 3 A.U.S.A's, including A.U.S.A Zelinsky "Knew - or should have known" that the CDR's Agent Holiday used to fabricate Exhibit 40 with, were false before the Government had him testify falsely and commit perjury to it. For instance:

Ⅳ. GOVERNMENT KNEW OR SHOULD HAVE KNOWN OF FALSE EVIDENCE

a. Agent Holiday testified that he "cross-checked" Exhibit 40 (after creating it) with the "underlying documents" (CDR's) to make sure it accurately reflected the information

provided. Even after Agent Holiday "Cross-checked" Exhibit 40 with those "underlying documents", he somehow managed to include a fatal pattern of fake entries in his summary evidence and to omit approximately 600 real texts.
(See EXHIBIT No.1), at **19**; cf. at **22.5 - 22.52**

b. Again - Agent Holiday testified - to the jury - that he was confident when he reviewed the information, that Exhibit 40 accurately reflected what is contained in the underlying voluminous documents.
(See EXHIBIT No.1), at **19.1 - 19.2**

c. Even over Hightower's objection to Agent Holiday's false testimony to the June 11, 2013, text messages at 2:09 p.m. and 4:35 p.m. - A.U.S.A. Zelinsky and Agent Holiday repeated the fallacy that the two texts were a dispute between Mr. Crawford and Mr. Wutoh over a man named Dave Dalton.
(See EXHIBIT No.1), at **19.5 - 19.6**

d. The Government had extracted via Cellbrite, text messages from Mr. Crawford's cell phone - over 2 years before Hightower's trial and therefore knew that the June 11, 2013, texts were blatant misrepresentations for the jury.
(See EXHIBIT No.1), at **101 - 101.5**

9.) <u>Ms. Zantia Jones</u> bolstered the opening statement lie of A.U.S.A. Zelinsky made to the jury surrounding the sale of the pick-up truck to me with 8 material lies throughout trial. For instance:

<u>VI.</u>   8 MATERIAL LIES BY Ms. JONES THROUGHOUT TRIAL

<u>MS. JONES</u> – Ms. Jones testified falsely that she first came in
<u>LIE # 1</u>    Contact with me on Friday, September 20, 2013.
       (<u>See EXHIBIT No. 1</u>), at **66.5 ; 66.9 – 66.11**

<u>THE TRUTH</u> – Both the trial testimony of Agent Holiday and
       of Ms. Jones' prove that Hightower first contacted
       Ms. Jones on Monday, September 16, 2013, when he
       called her – then came by her house shortly after.
       (<u>See EXHIBIT No.1</u>), at **18.12 ; 66.2**

<u>MS. JONES</u> – Ms. Jones testified falsely on several occasions that
<u>LIE # 2</u>    the truck was in both her name and her boyfriends
       names.
       (<u>See EXHIBIT No.1</u>), at **66.3 ; 66.5 ; 66.6 ; 66.11**

<u>THE TRUTH</u> – Official Maryland Motor Vehicle Administration (MVA)
       records of Hightower's account from the sale of the
       truck prove that Ms. Jones testified falsely and lied
       to the jury, because the truck was "ONLY" in her name.
       (<u>See EXHIBIT No.1</u>), at **70.1**

-41-

MS. JONES – Ms. Jones testified falsely that she sold the truck to
LIE #3       Hightower on Saturday, September 21, 2013, in the
             afternoon (1:48 p.m. – 1:54 p.m.).
             (See EXHIBIT No. 1), at **66.6 – 66.7**

THE TRUTH – Official MVA records from Hightower's account related
            to the pick-up truck sale, prove that Ms. Jones
            testified falsely and lied to the jury, because Ms. Jones
            and Hightower both signed and dated the title at
            the time of sale and that date was Friday,
            September 20, 2013.
            (See EXHIBIT No. 1), at **70.2**

            The expert testimony of Agent Wilde prove that the
            last time Hightower was at Ms. Jones house was
            late-night-Friday, September 20, 2013, between
            10:16 p.m. and 11:05 p.m..
            (See EXHIBIT No. 1), at **20.1 – 20.5**

MS. JONES – Ms. Jones testified falsely that she and her boyfriend
LIE #4       both signed the title over to Hightower on Saturday,
             September 21, 2013, when Hightower was at her house
             that afternoon.
             (See EXHIBIT No. 1), at **66.5 ; 66.11**

THE TRUTH – Official MVA records from Hightower's account related
            to the sale of the truck prove Ms. Jones testified falsely
            and lied to the jury, because her boyfriend "never"

-42-

Signed the title.
(See EXHIBIT No.1), at **70.2**

The expert testimony of Agent Wilde prove that Hightower
was "never" at Ms. Jones house "at all" during the
afternoon of Saturday, September 21, 2013, and also
placed Hightower in the "MONDAWMIN - PENN NORTH"
Community that entire afternoon.
(See EXHIBIT No.1), at **20.3 - 20.5**

MS. JONES - Ms. Jones testified falsely that Hightower met her
LIE # 5     at her house at 3913 Barrington Rd., Saturday,
September 21, 2013, between 1:48 p.m. and 1:54 p.m.
in the afternoon.
(See EXHIBIT No.1), at **66.5 - 66.6**

THE TRUTH - The expert testimony of Agent Wilde prove that
Ms. Jones testified falsely and lied to the jury,
because he testified that Hightower "ONLY" at Ms.
Jones house on Friday, September 20, 2013, from
10:16 p.m. to 11:05 p.m. "at night" and that
Hightower was "not" at or anywhere near the
residence of Ms. Jones - "at all" on Saturday
afternoon, September 21, 2013.
(See EXHIBIT No.1), at **20. - 20.5**

-43-

MS. JONES – Ms. Jones testified falsely that on Saturday, September
LIE # 6     21, 2013, Hightower "was not able to get tags for
            his new truck."
            (See EXHIBIT No. 1), at **66.7**

THE TRUTH – Official MVA records from Hightower's account related
            to the registration of his truck prove Ms. Jones lied
            to the jury and testified falsely, because Hightower
            purchased and applied for new tags for his truck
            on the afternoon of Saturday, September 21, 2013.
            Hightower received his new tags #91916 CE that day
            from Baltimore Auto Sales Inc.
            (See EXHIBIT No. 1), at **70 - 70.6**

MS. JONES – Ms. Jones testified falsely that she drove with
LIE #7      Hightower to see his mechanic on the afternoon of
            Friday, September 20, 2013.
            (See EXHIBIT No. 1), at **66.2 - 66.3**

THE TRUTH – The trial testimony of Agent Holiday is that Hightower
            first called Ms. Jones on Monday, September 16, 2013,
            and it, along with Ms. Jones' own testimony prove
            that Ms. Jones lied to the jury and testified
            falsely, because she testified that they drove the
            truck to a mechanic shortly after their first call.
            (See EXHIBIT No. 1), at **18.12** ; Cf. at **66.2**

-44-

MS. JONES - Ms. Jones testified falsely that calls between me and
LIE # 8    her on Monday, September 16, 2013, were actually
           calls between Hightower and her sister.
           (See EXHIBIT No.1), at **66.8 - 66.9**

THE TRUTH - The trial testimony of Agent Holiday once more prove
           that the first time Hightower ever called Ms. Jones
           was on Monday, September 16, 2013, and that Ms. Jones
           lied, because Ms. Jones' own testimony is that
           Hightower came by her house shortly after their
           first call.
           (See EXHIBIT No.1), at **18.12** ; cf. at **66.2**

10.) The Government knew Ms. Jones testified falsely and also
that Hightower had (1) applied for, (2) purchased, and (3) received
brand new tags for his truck - tag # 91916 CE, on the afternoon
of Saturday, September 21, 2013, from Baltimore Auto Sales, Inc..
Baltimore Auto Sales Inc. is a licensed MVA dealer that was
authorized during it's business hours on "Saturday's" to register
vehicle's and issue new tags to customers. The Government did
know Ms. Jones lied and committed perjury. For instance :

VII. GOVERNMENT KNEW OR SHOULD HAVE KNOWN OF FALSE TESTIMONY

   a. The Government knew Ms. Jones testified falsely and let it
      pass uncorrected, because - post trial, in the Governments
      reply to Hightower's opposition to PSR Motion - A.U.S.A.
      Zelinsky acknowledged the fact that the Government did

-45-

possess, in it's pretrial discovery, a copy of the official
MVA receipt from Hightower's account showing he purchased
new tags on Saturday, September 21, 2013, from Baltimore
Auto Sales, Inc,.
(See EXHIBIT No. 1), at **4**

* Although A.U.S.A. Zelinsky stated that the Government
obtained the receipt from "MVA-Officials" - he still
suggested - without any proof - that the official receipt
was not accurate, then AUSA Zelinsky further suggested
that - "Unless (Hightower) has access to a hitherto-unknown
MVA facility, there is no way he could have "obtained tags
for the truck" from the Maryland MVA on September 21, 2013,
a Saturday."
(See EXHIBIT NO. 1), at **4**

b, The Government also knew that Hightower was at
Baltimore Auto Sales, Inc. on Saturday afternoon -
September 21, 2013, because Government expert witness
Agent Wilde testified that Hightower was there in that
immediate vicinity at 1:18 p.m, .
(See EXHIBIT No. 1), at **20.3**

c. In addition to Agent Wilde's expert testimony that
Hightower was at Baltimore Auto Sales at 1:18 p.m.
Saturday - afternoon of September 21, 2013, and the fact
~~And the~~ AUSA. Zelinsky acknowledged the Government
possessed a copy of the receipt to prove where Hightower

-46-

was, Official Geico records from Hightower's insurance policy also prove that he added his truck to the policy 2 hours before he went to Baltimore Auto Sales to pick up new tags.

Specifically, Geico affirmed Hightower added the truck his existing insurance policy at 11:15 a.m., Saturday, September 21, 2013, Geico policy # 4312333034. (See EXHIBIT No. 1), at **90 - 90.1**

d. Hightower's Geico insurance policy # 4312333034 was on three official MVA documents in the business records of Baltimore Auto Sales Inc., from the original registration and purchase of new tags (tag # 91916 CE) on Saturday, September 21, 2013. For instance :

1. Application for Certificate of Title and Application for New Registration Plates (tags). ; (See EXHIBIT No. 1), at **70**

2. A Temporary (30 Day) Inspection Waiver ; and (See EXHIBIT No. 1), at **70.3**

3. Vehicle 30-Day temporary registration from 9/21/2013. (See EXHIBIT No. 1), at **70.5** - Lower half

11.) In addition to the 18 material lies herein above, Government expert witness-Agent Wilde offered expert testimony that on

-47-

Saturday, September 21, 2013, Hightower's phone (443-983-1240) had a total of 16 calls -(incoming and outgoing)- which generated pings at several T-Mobile cell towers throughout Baltimore leading up to Mr. Watch's death, but 12 of the 16 calls with cell tower pings were absolutely fake. For instance:

## VIII. 12 MATERIAL LIES THROUGHOUT TRIAL BY EXPERT AGENT WILDE

   a. In Exhibit 50- the maps-for Saturday, September 21, 2013, Agent Wilde linked a material pattern of 12 false calls and fake cell tower location pings to Hightower's phone. For instance:

AGENT WILDE - #1 - 1:18 p.m., (See EXHIBIT No.1), 20.3
12 LIES         #2 - 1:19 p.m., (See EXHIBIT No.1), 20.3
                #3 - 1:19 p.m., (See EXHIBIT No.1), 20.3
                #4 - 1:30 p.m., (See EXHIBIT No.1), 20.3
                #5 - 1:36 p.m., (See EXHIBIT No.1), 20.3
                #6 - 1:38 p.m., (See EXHIBIT No.1), 20.4
                #7 - 2:31 p.m., (See EXHIBIT No.1), 20.4
                #8 - 2:32 p.m., (See EXHIBIT No.1), 20.4
                #9 - 2:33 p.m., (See EXHIBIT No.1), 20.4
                #10 - 4:53 p.m., (See EXHIBIT No.1), 20.6
                #11 - 4:59 p.m., (See EXHIBIT No.1), 20.7
                #12 - 9:50 p.m., (See EXHIBIT No.1), 20.8

THE TRUTH - Official T-Mobile CDR's-Hightower's account prove that Hightower "ONLY" had 4 calls on Saturday, September

-48-

21, 2013, the entire day, So Agent Wilde testified falsely to Government exhibit 50 – the maps, also Exhibit 50 is false evidence.
(See EXHIBIT No. 1), at **22.1**

## HIGHTOWER DOES NOT POSE A DANGER TO THE COMMUNITY OR ANY OTHER PERSON / HIMSELF

From the outset, Hightower reminds this Honorable Court that he is, in fact, innocent of the crimes for which he was wrongly convicted due to the Government misconduct as laid out in detail herein above.

Prior to his arrest, Hightower had maintained gainful employment and was a productive member of his community. He also took part in and completed several programs that improved on his character, growth, and development. Programs that were not only beneficial to himself, but others in the community as well when those acquired skills are put into practice. (See EXHIBIT **D**)

Hightower has continued this positive, beneficial and productive practice of programming and improving on his character and life skills since he's been incarcerated. Even in the face of the injustices he's been living, he still taking advantage of any available programs and self study classes that can benefit him both while he's incarcerated and upon his release as well. See EXHIBIT A-2

-49-

Hightower's continued incarceration serves no penological purpose and only furthers the injustice he's suffered as being wrongfully accused and convicted. It also furthers his risk of contracting CovID-19 which would likely be deadly to him given his underlying medical conditions and compromised immune system.

Releasing Hightower to home confinement would not create any unwarranted sentencing disparities — as innocent people aren't sentenced for crimes they did not commit.

Releasing Hightower would bring about justice that is warranted and deserved, and it also would help restore some lost faith and integrity back in the justice system.

## CONCLUSION

Individually and cumulatively, Hightower has offered this Honorable Court - "extraordinary and compelling circumstances" warranting a sentence reduction for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Several Courts have recognized that the First Step Act's amendment to § 3582(c)(1)(A) "vests Courts with independent discretion" to grant compassionate release. (United States v. Hope, 2020 U.S. Dist. Lexis 86395 (S.D. Fla. 2020)). In fact, "the district Court assumes the same discretion as the B.O.P. Director when it

considers a compassionate release motion." (United States v. Brown, 411 F. Supp. 3d 446 (S.D. Iowa 2019)). Also, this Honorable Court has the authority to determine what constitutes "extraordinary and compelling circumstances" itself, independent of the Director of the B.O.P. (United States v. Cantu, 423 F. Supp. 3d 345 (S.D. Tex. 2019)).

And finally, as the U.S. District Court for the District of Maryland ruled in Carter v. United States, 2020 U.S. Dist. LEXIS 68343, the Honorable Judge Hollander opined that the statute § 3582(c)(1)(A) "may reduce the term of imprisonment" if it wants to.

Hightower prays this Honorable Court recognize and exercise it's inherent authority and grant his 18 U.S.C. § 3582(c)(1)(A)(i) motion.

## RELIEF PRAYED FOR

Based on the herein foregoing, Hightower prays this Honorable Court grant him time served, immediate release and imposition of his five years of supervised relief.

Hold a hearing on the instant motion allowing Hightower to further advance his claims.

And/or any relief that Justice Requires.

Dated this 14th day of December, 2020.

Hightower is in an institution that is on lockdown and is unable to type or copy the instant motion. Nor does he have access to relevant legal materials.

As a result, Hightower respectfully requests that this Honorable Court furnish respondent with a copy of the instant motion and attachments/exhibits.

I, Matthew Hightower, swear under penalty of perjury by the laws of the United States of America that the herein foregoing is true and correct to the best of my knowledge and belief. (28 U.S.C. § 1746).

Respectfully submitted,

Matthew Hightower
Matthew Hightower
Petitioner Pro-se

-52-